Delgado & Co. v. Wilbur & Co.; Clark v. Wilbur & Co.; Louisiana National Bank v. Maxwell.

or in default thereof that there be judgment in favor of said bank and against Isaac Delgado and Samuel Delgado *in solido,* condemning them to pay to the said Louisiana National Bank eighteen hundred dollars, with interest at the rate of five per cent. from the eighth February, 1870, until paid, and costs.

And it is further ordered, adjudged and decreed that there be judgment in favor of the Louisiana National Bank and against S. B. Clark, condemning him to deliver to the bank the eight barrels of molasses released to him in the suit of S. B. Clark *v.* A. C. Wilbur & Co., No. 2668 of the docket of the Seventh District Court, or in default thereof that there be judgment in favor of the Louisiana National Bank and against the said S. B. Clark, condemning him to pay to said bank two hundred and thirty-one dollars and thirty-one cents; the judgments as to each to be satisfied on payment of the debt, interests and costs due the said bank, appellees to pay the costs of appeal.

---

LUDELING, C. J.    I concur in the decree made in this cause solely on the ground that a third party can not be prejudiced by a privilege not recorded.    Constitution of 1868, 123.

---

HOWELL, J.    I concur for the reason given by the Chief Justice.
Rehearing refused.

---

No. 3700.

JOSEPH FUENTES and al. *v.* MYRA CLARK GAINES.

Where the judge of the Second District Court, parish of Orleans, had refused to transfer a cause to the Circuit Court of the United States, because that court has not jurisdiction to try the principal, if not the only object of the suit, which was the legality and sufficiency of the evidence upon which a lost will was admitted to probate, and the revocation of said will;

Held—That the United States are without jurisdiction in probate matters, and that this point is too well settled to be now questioned.

It is equally well settled that it was not intended to extend the jurisdiction of the United States courts over causes brought before them on removal beyond the limits prescribed by their original jurisdiction.

The subject matter of this suit is purely probate in its character, to wit:   The revocation of the probate of a will, and the suit was properly brought, *under the circumstances of the case,* in the probate court which had made the order to record and execute the will.

Where parties can not attack the probate of a will in the Circuit Court of the United States, before which the petitory action against them has been brought, they should be permitted, *ex necessitate rei,* to bring the suit in the State probate court in which the order for probate was granted.   Otherwise, it would be possible for a will to be fraudulently probated, and a suit to be instituted against persons in possession under titles from the heirs in the Circuit Court of the United States, without the possibility on the part of the possessors to expose the fraud.

Where, in a judgment, the court that rendered it carefully guarded against any inference being drawn that the decree should not be open to attack by a direct action in the name of interested third parties, the plea of *res judicata* does not lie.

An *ex parte* order admitting a will to probate is not a judgment binding upon those who are not parties to the proceeding. The *ex parte* order for the recording and execution of the will is a preliminary proceeding for the administration of an estate, if not a *final judgment* which concludes every one. It is a mere *license* to authorize the executor or heir to carry out the provisions of the testament; and the verity and validity of the will must be established whenever questioned by third persons from whom property is judicially demanded under the will.

The objection to the irrelevancy of evidence is a very weak one when the case is tried without the intervention of a jury. In such a case, the only question, in effect, is upon the sufficiency or weight of the evidence. If the evidence found in the record is irrelevant, it will be ignored by the court.

Objections not stated in a bill of exceptions will not be considered by this court.

Article 613 of the Code of Practice, concerning prescription, clearly refers to a *judgment in a contested suit*, but which has been obtained through fraud, or because the defendant had lost the receipt given by the plaintiff. Article 1994 Civil Code applies to acts made in fraud of creditors.

Article 3542 Civil Code refers to actions for the nullity of testaments when the instituted heir is in possession of property under the will, and is sued by the heirs at law to annul the will and to take from the instituted heir the property. It does not apply to a case in which the defendant in a chancery suit is obliged to come to the probate court to establish a part of his defense in consequence of the limited jurisdiction of the Circuit Court of the United States.

Where the property in controversy is situated in Louisiana, within whose limits the owners thereof reside, their rights can only be barred by the laws of this State, which are binding on the Federal as well as the State courts. The Federal courts do not claim to bring foreign laws into this State.

The validity of a probated will is immaterial to third parties until they are disturbed under it in the possession of their property, and prescription against them could not begin to run until the cause of action had arisen; nor can prescription run against one in possession.

Where a will, when last seen, was in the possession of the testator, and it could not be found at his death, the presumption of the law in such a case is, that the testator destroyed it *animo cancellandi*, and the *onus* of rebutting this presumption is cast upon those seeking to establish the will. The opinions or suspicions of a witness can not overcome the presumption raised that the testator himself destroyed the will.

The contents of a lost will can not be proved by witnesses who derived their knowledge from the verbal declarations of the testator. It would practically authorize the making of a verbal testament, and a lost testament could thus be proved by evidence which would be incompetent to prove the will if produced in court.

It is necessary to prove that a lost olographic will contains all the essentials prescribed by law before it can be admitted to probate, to wit: That it was *wholly written, dated* and *signed by the testator*, and the witnesses must state the *facts* which are necessary to enable the court to determine whether or not the will is valid.

It is essential to specify the *day, month* and *year* to give a date to a testament in the sense of article 1588 of the Civil Code.

The facts required to be established by article 1655 Civil Code for the probating of an olographic will must be proved by competent testimony, and can not be inferred by the court.

APPEAL from the Second District Court, parish of Orleans. *Collens*, judge of the Seventh District Court, presiding in place of *Duvigneaud*, J., who recused himself. *Miles Taylor* and *J. McConnell*, for plaintiffs and appellees. *Fellows & Mills, Race, Foster* and *E. T. Merrick*, for defendant and appellant.

Justices concurring: Ludeling, Taliaferro and Wyly.

Howell, J., dissenting.

LUDELING, C. J. This is an appeal from a judgment of the Second District Court of the parish of Orleans, which revoked and declared invalid the will probated in 1856, as the will of Daniel Clark of 1813.

Fuentes and al. v. Myra Clark Gaines.

Joseph Fuentes and seventy-five other persons, named in the petition, allege that Myra Clark Gaines made application to the said Second District Court, on the eighteenth day of January, 1855, for the probate of an alleged lost will of Daniel Clark, dated July 13, 1813, and that upon hearing she obtained from this court an order by which said pretended lost will was recogn zed as the last will and testament of Daniel Clark, and it was ordered to be recorded and executed as such. The petitioners aver that the said order or decree was obtained *ex parte*, and that by its terms it authorized any person, who might at any time become entitled to do so, to contest the said will and the probate thereof, and to show that no such will was executed, either in a direct action or as a means of defense, by way of answer or exception whenever the said will should be set up as a muniment of title. They aver that the said Myra Clark Gaines has, since she obtained the probate of said will, instituted suit against them in the Circuit Court of the United States in the State of Louisiana, in which suits she sets up said will as a muniment of title as the instituted heir of Daniel Clark, and she claims and demands from them sundry tracts of land and properties of large value. They allege that they can not contest the validity of said pretended will of 1813, in the Circuit Court of the United States, on account of the peculiar jurisdiction of said court, so long as the order of probate remains uncanceled by the Second District Court.

They allege that the probate of the pretended will of 1813 was a gross fraud upon the rights of petitioners, that the will never existed, that the evidence and testimony of the witnesses, upon which the will was probated was false or erroneous, illegal and insufficient. That if any will was made by the said Daniel Clark at any time other than the one admitted to probate and ordered to be executed by a decree of the Probate Court, dated on the seventeenth day of August, 1813, which is expressly denied, it was destroyed or suppressed by Daniel Clark himself. They allege that Clark left no will whatever posterior to that dated May 20, 1811, which was probated in the Probate Court of the parish of Orleans on the seventeenth of August, 1813, by which Mary Clark, the mother of Daniel Clark, was instituted his universal legatee, and which probate and will remained in force, for nearly half a century, as the basis of title to the property of the succession of Daniel Clark.

The petition then represents that Daniel Clark was never married; that he had no legitimate child; that he never recognized Myra as his legitimate child; that he made ample provisions for her as his illegitimate child by secret trusts, which trusts were duly executed by those confided with the property intended for her; and that Clark did not make and could not have made a will in favor of Myra, on account of her status, as the law of Louisiana forbade it.

They pray that the will of 1813 may be revoked, and that the pro-
bate thereof may be recalled and annulled. Mrs. Myra Clark Gaines.
*in limine litis*, prayed for the transfer of this cause to the Circuit Court
of the United States, alleging that she is a citizen of the State of
New York, and that the matter in controversy exceeds five hundred
dollars. She made the affidavit and gave the bond required by law.
Her application having been refused, she again applied to have the
cause transferred to the Circuit Court of the United States, under the
act of Congress dated second March, 1867, and her application was a
second time denied. On the tenth of January, 1870, Mrs. Gaines filed
the plea of *res judicata* against the city of New Orleans. On the
eighteenth of January she filed an application for the recusation of
the Judge of the Second District Court, and he recused himself. On
the twenty sixth of March, 1870, she filed the following exceptions:
That the Second District Court had no jurisdiction or right to proceed
further with this cause, after her said applications to have the cause
transferred to the Circuit Court of the United States. "That this
court is not vested with jurisdiction of this suit, in this that the de-
fendant is the heir at law and universal legatee of Daniel Clark, and in
possession, and that the constitutional and legal jurisdiction of this
court is confined exclusively to probate jurisdiction, and does not
extend to a jurisdiction of this cause, either as regards the parties
thereto or the subject matter of said suit." She further excepts that
the plaintiffs have been improperly joined, in instituting this suit.
That they have not shown in themselves any authority or legal interest
in and to the succession of Daniel Clark, either as heirs, legatees or
otherwise, and they are thus without right to contest the legitimacy of
the defendant as heir of Daniel Clark, and thus without right to contest
the validity of said will of Clark, and the defendant's rights under the
same. She excepted that the allegations, charging fraud, error, illegali-
ty and insufficiency in the evidence upon which the will of 1813 was
admitted to probate, are vague and indefinite, and not sufficiently clear
to enable defendant to know as against what evidence or what particu-
lar testimony of any of said witnesses she is required to defend her
rights against said alleged fraud, error, illegality or insufficiency. She
further excepts that the court has not jurisdiction to try the question
of her *status* inasmuch as that question was decided by the Circuit
Court of the United States, in the suit of Myra Clark Gaines *v.* City
of New Orleans and others, instituted in the Circuit Court of the
United States for the Fifth Circuit, and the then Eastern District of
Louisiana, No. 2695, which decision she alleges is *res judicata.*

The judge *a quo* maintained the exception so far as to require the
plaintiffs to amend their petition in that part charging "fraud, error,
illegality and insufficiency in the evidence," etc., and he overruled the

other exceptions. On the twenty-eighth of April, 1870, the petition of intervention of Rudolph Huberwald and others was filed. On the seventh of May, 1870, the intervention of John and James C. Davidson was filed.

On the eleventh of February, 1871, in obedience to the order of the court, the petitioners filed their supplemental petition, setting forth specifically the grounds for their allegations of fraud and error, and designating particularly the alleged illegality and insufficiency of the evidence on which the will was probated, etc.

On the twenty-ninth of April, 1871, she filed her answer. It admits the probate of the will of 1813, but denies that the evidence and testimony upon which the will was admitted to probate was false, erroneous, illegal or insufficient. She denies that the plaintiffs or intervenors or any of them allege any right of action to contest the validity of the order of probate, or to seek the revocation of the will of Clark of the thirteenth July, 1813, and she avers that that decree has acquired the force of *res judicata*. She further pleads the prescription of one, three, five and ten years.

On the third of June following, she filed the plea of *res judicata* as to all the parties, on the question of her status.

This record, consisting of 575 pages in manuscript and portions of six printed volumes, furnishes proof of the patience and care with which this case has been tried. During the course of the trial, upwards of thirty bills of exceptions were signed. The elaborate arguments, oral and by briefs of counsel, exhibit great labor, research and ability; and they have greatly lessened the labors of this court.

In this court the counsel for the defendant have filed an assignment of errors, which groups together the questions, which they deem important in this case. They are substantially as follows:

I. That the Second District Court was without jurisdiction to try the cause, after the defendant had made her application to have the cause transferred to the Circuit Court of the United States.

II. That said Court was without jurisdiction on account of the subject matter of the suit.

III. That the plaintiffs and intervenors allege no interest in the estate of Daniel Clark, which could authorize them to institute a suit to revoke the last will of Daniel Clark.

IV. That said court erred in denying the authority of the thing adjudged to the decrees of the Supreme Court and Circuit Court of the United States as set forth in defendant's several pleas of *res judicata*.

V. That said court erred in receiving and rejecting evidence as shown by the several bills of exceptions.

VI. That said court erred in overruling defendant's pleas of prescription.

VII. That the court erred in deciding said cause in favor of the plaintiffs and intervenors.

We will take up these questions in their order.

*First*—We are of opinion the judge *a quo* properly refused to transfer the cause to the Circuit Court of the United States, because that court has not jurisdiction to try the principal if not the only objects of this suit, the legality and sufficiency of the evidence upon which the lost will was admitted to probate, and the revocation of the will. That the United States Courts are without jurisdiction in probate matters is too well settled to be now questioned. 9 Peters 174, Tarver *v.* Tarver; 2 Harv. 619; Gaines *v.* Relf & Chew, and 6 Wal. 642, Gaines *v.* New Orleans.

And it seems equally well settled that "it was not intended to extend the jurisdiction of the United States Courts over causes brought before them on removal beyond the limits prescribed by their original jurisdiction." Conklin 155; 2 Sumners 338.

*Second*—The subject matter of this suit is purely probate in its character, to wit, the revocation of the probate of a will; and the suit was properly brought, under the circumstances of this case, in the Probate Court, which had made the order to record and execute the will. 13 An. 138, 177; 1 La. 19, McCombs *v.* Dunbar, et al; 8 N. S. 520, Harty *v.* Harty; 5 La. 394; 5 Rob. 286; 1 An. 171; 17 La. 4.

*Third*—The plaintiffs and intervenors substantially allege that they have been sued, by Mrs. Gaines, for property, which she alleges belonged to the succession of Daniel Clark, and of which they are in possession; that she claims the same under the will of Clark, dated thirteenth July, 1813; that Clark left no other testament than that dated twentieth May, 1811, by which Mary Clark, his mother, was instituted heir, and that that will has been the basis of title to the property of his succession for nearly half a century. And the bill in equity of the said Myra C. Gaines against these parties alleges that they (the plaintiffs in this suit) sometimes "pretend that one Richard Relf and one Beverley Chew sold said property to the defendants as testamentary executors of a will of said Daniel Clark, made in the year 1811, which had been admitted to probate in the Probate Court for the parish and city of New Orleans, and as attorneys in fact for one Mary Clark, the devisee in said will of 1811 named," etc. And in the letter of Mrs. Gaines to the Mayor of New Orleans, dated sixth September, 1870, claiming from the city $4,996,039 32 cents, and proposing to compromise for $4,000,000, she gives a history, or the chain, of title back to the estate of Clark. These admissions show that they are in possession under titles derived from Relf & Chew either as executors of the will of Clark or as the attorneys in fact of Mary Clark, the forced heir, and universal legatee under the will of 1811, of Daniel Clark.

They are interested therefore to show that the will of 1813 is not valid, when it is opposed to them as a muniment of an adverse and better title to property in their possession.

And as they can not attack the probate of the will in the Circuit Court of the United States, where the petitory action against them has been brought, they should be permitted, *ex necessitate rei,* to bring this suit in the probate court, in which the order for probate was granted; otherwise, it would be possible for a will to be fraudulently probated, and then to sue persons in possession under titles from the heirs, in the Circuit Courts of the United States, without the possibility on the part of the possessors to expose the fraud. See 13 An. 138; 177; 5 La. 394. Lewis' Heirs *v.* His Executors, 17 La. 4; Roberts *v.* Allier's Agent.

*Fourth*—It is urged that the court *a qua* erred in not holding that the order, probating the will of thirteenth July, 1813, is *res judicata.*

It would seem from the decisions of this court, reported in the thirteenth volume of the Annuals, pages 139 and 178, that this question was definitely settled.

In the case of the heirs of Mary Clark *v.* Myra C. Gaines, the court said: "The decree of the Supreme Court, which it is the object of this suit to annul, is one which, upon its face invited contestation; for it reserves by its terms the right to attack the will probated, not only to all persons who were not parties to the proceedings for the probate of the will, but even to one who was a party to those proceedings." * * * "To refuse, therefore, to the plaintiffs the right of action to set aside the probate of this will, would be, in fact, to deny them the remedy which the very decree of probate purported to secure to them. It is not in this court such an agreement should meet with favor. Our decree in the case of the succession of Clark, 11 An., meant what it expressed. Our reservation of the rights of all parties in interest was substantial, not illusory."

And in the case of De la Croix *v.* Gaines, the court said: "By referring to the case of Clark's succession in 11 An. it will be seen that we carefully guarded against any inference being drawn that the decree should not be open to attack. We even asserted that it would be open to attack by a direct action in the name of a party interested. And if, as alleged (and we must at this stage of the case take the allegation for the truth), the defendant is seeking to avail herself in the courts of the United States of a rule there recognized, that an *ex parte* decree probating a will, although open to question collaterally, in all the courts of the State where it was rendered, is not to be so questioned in a United States court, but it is to be conclusive upon all the world, there is a manifest propriety in giving the relief, which was reserved by the very terms of our former opinion and decree to third persons, whose interest might be sought to be affected by it."

But if we leave out of view what has been expressly decided in regard to the effect of the probate of the will in question as to third persons, and test the question by the jurisprudence of this State and of other countries on the subject, we will arrive at the same conclusion, to wit: that an *ex parte* order, admitting a will to probate, is not a judgment binding upon those who are not parties to the proceedings; that the *ex parte* order for the recording and execution of the will is a preliminary proceeding for the administration of an estate, and not a final judgment which concludes any one; it is a mere license to authorize the executor or heir to carry out the provisions of the testament, and the verity and validity of the will must be established whenever questioned by third persons, from whom property is judicially demanded under the will. 10 Mart. 1; 7 N. S. 470; 2 La. 26; 11 La. 388, 395; 12 La. 214; 17 La. 4, Robert N. Allier's agent; 2 An. 724; 4 An. 570; Succession of Dupuy; 1 Rob. 115, Rachal et als *v.* Rachal et. als; Marcadé, vol. 4; Tit. 11 Donations et Testaments, art. 970, No. 18, p. 12; Code of Practice, art. 943.

"A will" says Jarman, "is proved in common form where the executor presents it before the judge, and in the absence of and without citing the parties interested, produces witnesses to prove the same. Upon the testimony of these witnesses that the will exhibited is the true, whole and last will and testament of the deceased, and sometimes upon less proof and even upon the oath of the executor alone, the judge grants probate thereof. This mode of proof, though not in very common use, is still adopted and practiced upon in some of the United States.     *     *     *     But it is not conclusive upon heirs or distributees and may be opened and set aside, if necessary, and applied for in time. At common law, when a will had been proved only in common form, without notice to those interested, the probate might be re-examined within thirty years after probate."

We have seen that the judges who rendered the decision probating the will of 1813 did not themselves consider it binding on any one; that it was a mere license to Myra Clark Gaines to sue. Without a probate of the will she could not have gone into another court to sue for property as the instituted heir of Clark; with the probate she could sue and claim property under the will, but those to whom she opposed this will could deny that such a will existed when Clark died; that the probate was made on legal or sufficient evidence, and that the will was valid under the laws of Louisiana; and the onus of proving these facts would devolve upon the party who asserted the validity of the will. Marcadé, vol. 4, p. 12; 13 An. 86. It appears from the opinion in the case of De la Croix *v.* Gaines, 13 An., as well as from the probate record in evidence in this suit, that there were parties who came forward to contest the existence and the validity of the will of

1813, when Myra C. Gaines had it probated, but they were refused the right to contest its validity or existence, on the grounds, substantially, that their interest was not affected by the probate; that when they were disturbed in their possessions it would be time enough for them to oppose the probate of the will.

If this ruling was correct then, how can it be pretended that the probate proceedings are binding on them now? Is it possible that a system of jurisprudence exists anywhere, which would allow a claimant to obtain an *ex parte* judgment, which would have the effect of destroying the titles of persons who never had notice of the claim— nay, of persons who were refused the right to contest the claim in the very proceedings wherein the *ex parte* order was made?

We think not; certainly it does not exist in Louisiana; and the judge *a quo* correctly overruled the first plea of *res judicata*.

It is next contended that the plea of *res judicata* against the city of New Orleans should have been maintained. The thing demanded in the former suit is not the same as that claimed in this action. "The authority of the thing adjudged takes place only with respect to what was the object of the judgment. The thing demanded must be the same; the demand must be founded on the same cause of action; the demand must be between the same parties, and formed by them against each other in the same quality." C. C. art. 2286. We deem it unnecessary to pass upon the other plea of *res judicata*, based upon the supposition that the Supreme Court of the United States has decided and fixed the status of Myra C. Gaines in Gaines *v.* Hennen, etc. If it be true that the Supreme Court of the United States have decided the question relative to her status, independently of the will of 1813, that august tribunal will no doubt adhere to that opinion. But we do not consider that question properly involved in this suit.

*Fifth*—It is not necessary to pass upon most of the bills of exceptions taken in this case, as they relate to evidence affecting the status of the defendant—which we do not consider necessary to decide, in consequence of the conclusion arrived at on other questions involved in this controversy.

We will remark, in the next place, that the objection of irrelevancy, urged to so much of the evidence offered, is a very weak objection, when the case is tried without the intervention of a jury. In such a case the only question, in effect, is upon the sufficiency or weight of the evidence. If any evidence be found in the record which we consider not relevant we will ignore it. 1 Greenl. 58.

There was no error in ruling the defendant to go to trial, without waiting for the intervenor, Elmore. The intervenor seems to have consented to let the trial proceed without him—at any rate he has not objected.

The defendant excepted to the reception of a translation of a letter from J. D. D. Bellechasse to D. W. Coxe, dated December 10, 1819, found in the record of the suit of Myra Clark Gaines *v.* City of New Orleans, and in connection therewith and to prove the loss of the original, its genuineness as a true copy or translation of the original, the deposition of W. Cope and G. B. Duncan, and the indorsement thereon made by F. Perrin, solicitor for Mrs. Gaines. It is shown that said translation was admitted in evidence in the above named suit, as a correct translation of the original letter, which was admitted by Mrs. Gaines' solicitor to be genuine, and Cope, who made the translation, swears it was correctly translated. It is alleged that the original letter is lost; it is not proved to be in existence, and it is quite certain it never was in the possession of the plaintiffs. Bellechasse was interrogated in regard to this letter, and he challenged its production. We think it was properly received in evidence in this case, as it was the best evidence which the nature of the case would admit of.

In regard to the bills of exception taken by the defendant to the rulings of the court striking out portions of the testimony of Boisfontaine and others, on the ground that the testimony was hearsay, we concur with the judge *a quo*.

A bill of exceptions was taken to the ruling of the judge admitting a letter written by Mazureaux to Coxe in May, 1842. The grounds stated in the bill of exceptions are, that, Mazureaux was alive during the pendency "of the litigation in the United States Court, and after issue joined in that suit, so that his direct testimony could have been taken." "He was counsel of record opposed to Myra Clark Gaines in the United States Court." "The status of Mrs. Gaines can not be inquired into in this case." "The letter contains (besides the facts stated) expressions of opinions which are not evidence."

We have already said we will not pass upon the question relating to the status of the defendant, further than it may be affected by our judgment in regard to the will of 1813. In so far as that letter contains opinions of the witness, it is not competent evidence. But we agree with the district judge that the other objections are not reasons for rejecting the evidence, even if we overlook the vagueness of the objections. But the counsel for the defendant have urged in their briefs and oral arguments other objections to the evidence. It is well settled that objections not stated in a bill of exceptions will not be considered by this court. We could as well be required to reject evidence which had been received without objection in the court of the first instance. A bill of exceptions was taken to the reception in evidence of the answers of Richard Relf to the bill in chancery in the case of Gaines and Husband *v.* Relf, Chew et als, filed in January, 1845, on the grounds following:

That judgment of the Supreme Court probating the will could not be attacked "after the lapse of time ; " that the status of Mrs. Gaines had been decided by the Federal Courts, and the plaintiffs have no right or authority to question her status; that the said Relf & Chew "were not interrogated under oath," and their answers were put at issue by a replication, that the answers "were *post litam motam ; "* that it is contrary to law and evidence that the allegations of a party in his own favor should be read in evidence by other persons not parties to such controversy, and because answers in chancery are not admissible in evidence; because the defendant was and is deprived of the benefit of cross-examining said Relf, and because there is no obligation on a suitor to offer testimony, which she believes to be false, erroneous and untrue ; that the testimony is *res inter alios acta* and irrelevant.

In order to act intelligently in receiving or rejecting this evidence, it will be necessary to bear in mind some of the facts disclosed by the voluminous records, containing the history of the remarkable litigation relative to the will, which forms the subject of this suit.   In June, 1834, Myra Clark Whitney (now Gaines) instituted proceedings to revoke the testament of Daniel Clark, dated twentieth May, 1811; and to probate his alleged lost will of thirteenth July, 1813.   The plaintiff in that proceeding took the testimony of Mr. and Mrs. Harper, S. B. Davis, Bellechasse, De la Croix, Boisfontaine and others by commission, and in 1836 when the heirs of Mary Clark, the universal legatee under the will of 1811, and the mother of Daniel Clark, and Relf & Chew, the executors of that will, insisted upon proceeding with the trial, submitted to a nonsuit rather than try the case.

In 1845 Mrs. Gaines instituted a suit against Relf & Chew, and others for the property of the succession of Clark, claiming as the legitimate heir and as the instituted heir under the lost will of Daniel Clark.   A demurrer was filed to the bill in equity, and subsequently an answer was filed by the said Relf & Chew.   The case was brought before the Supreme Court of the United States on the demurrer by a division of the judges on certain points, which were certified under the act of Congress.   The opinions of the judges were opposed on the following points:

1. Is the bill multifarious? and have the complainants a right to sue defendants jointly in this case?

2. Can the court entertain jurisdiction of this case, without probate of the will set up by the complainants, and which they charge to have been destroyed or suppressed ?

3. Has the court jurisdiction of this case, or does it belong exclusively to a court of law ?

The court said " the demurrer is not before the court, but the points certified.   In considering these points all the facts stated in the bill are admitted."

The court having held that the circuit court could not establish the lost will, said: " A deliberate consideration of the question leads us to say that both the general and the local law require the will of 1813 to be proved before any title can be set up under it. But this result does not authorize a negative answer to the second point. We think, under the circumstances, that the complainants are entitled to full and explicit answers from the defendants in regard to the above will. The answers, being obtained, may be used as evidence before the court of probate to establish the will of 1813 and revoke that of 1811. In order that the complainants may have the means of making, if they shall see fit, a formal application to the probate court, for the proof of the last will and the revocation of the first, having the answers of the executors, jurisdiction as to this matter may be sustained." 2 How. 646. In 1848, about three years after the decision on the demurrer, Mrs. Gaines filed an amended bill, in which among other things she said, " And your orator and oratrix further show unto your Honors, by way of amendment to said bill, that they will renounce for all the purposes of this suit against the defendants herein named, all claims, which your ora-trix has heretofore made to the estate of said Daniel Clark, as his universal heir and devisee by the said will of 1813, and that she will, as against the defendants herein named, assert and maintain her right, title and equity, to the four-fifths part of the property and rights embraced in this amended bill and supplement, as the forced heir of the said Daniel Clark, deceased," etc. Vol. 2 N. O. Record p. 78. And availing herself of the right given to her by the court, she propounded divers questions to the defendants.

This suit was finally decided against Myra Clarke Gaines in 1852. 12 How. 539. On the eighteenth of January, 1855, Mrs. Gaines filed in the Second District Court of the parish of Orleans, her petition praying for the probate and execution of the will of 1813. The city of New Orleans, F. D. De la Croix and Richard Relf filed interventions, and prayed to be allowed to contest the probate of the will. Mrs. Gaines excepted to their intervention, on the ground " that a probate of a will is a proceeding to be had ex parte, a mere preliminary step in the administration of an estate not binding on third parties, and open to contestation in any proceeding based upon its validity, in which it is relied upon as the basis of title, or of any right asserted as against third parties; and on the further ground, that the intervening parties are without interest in the subject matter before the court, and therefore can not be permitted to embarrass the proceedings." And the interventions were dismissed. Now the evidence objected to is the answers of Richard Relf to the bill in equity filed by Myra Clark Gaines, to obtain which the Supreme Court of the United States said it would maintain the jurisdiction of the Circuit Court,

notwithstanding the demurrer was technically correct, in order that said answers might be used in evidence on the probate of the will of 1813. The answers were sworn to. The complainant had full opportunity to question Relf upon the subject matter of the lost will, and the present suit is between the *ayant cause* of the defendants in the suit, in which said answers were made. But complete mutuality or identity of parties is not necessary. "It is generally deemed sufficient" says Greenleaf, "if the matters in issue were the same in both cases, and the party, against whom the deposition is offered, had full power to cross-examine the witness. Thus, where a bill was pending in chancery, in favor of one plaintiff against several defendants, upon which the court ordered an issue of *devisavit vel non*, in which the defendants in chancery should be plaintiffs and the plaintiffs in chancery defendant, and the issue was found for the plaintiffs—after which the plaintiff in chancery brought an ejectment on his own demise, claiming, as heir at law of the same testator, against one of those defendants alone, who claimed as devisee under the will formerly in controversy, it was held, that the testimony of one of the subscribing witnesses to the will, who was examined at the former trial, but had since died, might be proved by the defendant in the second action, notwithstanding the parties were not all the same; for the same matter was in controversy, in both cases, and the lessor of the plaintiff had precisely the same power of objecting to the competency of the witness, the same right of calling witnesses to discredit or contradict his testimony, and the same right of cross-examination, in the one as in the other. * * * The same rule applies to privies, as well as to parties." 1 Greenl. §§ 553, 554.

The same author says: "And though the two trials were not between the same parties, yet, if the second trial is between those who represent the parties to the first, by privity in blood, in law, or in estate, the evidence is admissible. And if, in a dispute respecting lands, any fact comes directly in issue, the testimony given to that fact is admissible to prove the same point or fact in another action between the same parties or their privies, though the last suit be for other lands." 1 Greenl. § 164. 7 Rob. 440.

Relf had died before the institution of this suit. If he had been living he would have been a competent witness in the case. But his sworn declarations in answer to charges propounded against him by the said Myra C. Gaines, are in existence in that suit. The Supreme Court said his answers might be used as evidence to probate the will of 1813; and the said Gaines has had full power and opportunity to question and cross-question him. It is difficult, therefore, to see any substantial reason, why the evidence can not be used, by those who have an interest to prove no such will existed at the death of Clark.

7

The great length of time that intervened between the death of Clark, nay, between the period when the defendant reached her majority, and the institution of the proceedings to probate the will of 1813, in 1834 and 1855; the fact that on those occasions she declined to contest the validity of the will with those who held property under the will of 1811, who were ready to try the issue with her; and the further fact that the plaintiff did not have an opportunity to show that the will was invalid or not legally probated, until after their possessions were disturbed by the suits in the United States Circuit Court, instituted since the death of Relf, are circumstances which incline us to receive the evidence. The general rule, that the best evidence the nature of the case will admit of would seem to decide this question. "It is only another form of expression of the idea that if one loses the higher proof, he may use the next best in his power. The case admits of no better evidence than that which you possess, if the superior proof has been lost without your fault." 2 La. 168.

Over forty years after the death of Clark, long after his contemporaries had passed off the stage of life, the plaintiffs are obliged to attack the will set up by defendant as the muniment of her title to lands in their possession under titles derived from his succession. We are of opinion that the answers should have been received.

*Sixth*—The plea of prescription was properly overruled.

The prescription, upon which counsel in their briefs appear to rely, is that of one and five years, and they cite articles 1994 and 3542 Ray's C. C. and article 613 Code of Practice. This article of the code of practice clearly refers to a judgment in a contested suit, but which has been obtained through fraud, or because the defendant had lost the receipt given him by the plaintiff. Article 1994 of the Civil Code applies to acts made in fraud of creditors. Article 3542 refers to actions for the nullity of testaments, when the instituted heir is in possession of property under the will, and is sued by the heirs at law to annul the will, and take from the instituted heir the property. It does not apply to a case of this kind, in which a defendant in a suit in chancery is obliged to come to the Probate Court to establish a part of his defense in consequence of the limited jurisdiction of the Circuit Court or the United States.

The maxim " *Quæ temporalia sunt ad agendum, perpetua sunt ad excipiendum*" is applicable to this case. If the petitory action, instituted in the Circuit Court, had been filed in one of the district courts of this State, no one would pretend that the defendants could not attack the will and ask for judgment annulling it. She can not deprive them of that right by suing in the Circuit Court. Their rights can be barred only by the laws of Louisiana, where they reside, and where their property in controversy is situated, which are obligatory on the Fed-

eral as well as State courts; the Federal courts do not claim the right to bring foreign laws into this State. The only right which the plaintiffs in this suit have to attack this will is because they are disturbed in the possession of their property by the suits in chancery aforesaid. Until they were sued in the Federal court they had no cause of action. It was immaterial to them how many wills were probated, unless they were disturbed in the possession of their property, and prescription against them could not have run until their cause of action had arisen. Nor can prescription run against one in possession. There is no foundation for the plea of prescription; and we concur in the views of the judge *a quo*, when he says: "If the prescription of five years could run against one having and tracing undisturbed possession from 1815 down to the time his right is first attacked in 1865, say fifty years, then success is assured by law to a fraud easily and safely practiced. It would suffice, in any old and almost forgotten succession, to probate *ex parte* a spurious and invalid will; wait in masterly inaction during five years, and then sue the previously recognized heirs or their transferrees for the property derived from the estate. In vain would they appeal to the fact that the probate was *ex parte*; urge that the law did not give the probate the effect of a public judgment concluding them—claim the right reserved in their favor to contest it; in vain would they offer to prove forgery, bastardy, violation of public policy and morals and infraction of prohibitory law. The plea of prescription, if operating thus silently and insidiously against their quiet possession and title, in favor of one who makes no pretense of possession, would close the door to all investigation, and a demonstrable fraud against the real right, and against the law itself, would be infallibly triumphant. We do not recognize such to be the law or jurisprudence of Louisiana.

*Seventh*—The last assignment of errors presents the questions involved on the merits of this cause; those we deem important are the following. Did Daniel Clark leave a testament dated on the thirteenth July, 1813? Are the contents of that will proved by two credible witnesses, who read, or had had read to them, the will?

In proving a lost olographic will, with a view to its probate and execution, is it necessary to prove all the essentials of an olographic will? Or, is a paper, containing testamentary dispositions, wholly written and signed by the testator, but dated in July, 1813, without specifying any day, an olographic will? Is it dated?

Can an olographic will be proved, except by those who have a knowledge of the handwriting of the testator, from having often seen him write, and sign his name? And must that knowledge and the source of that knowledge be stated by the witness?

In deciding these questions we would have less difficulty if this court had not, in an *ex parte* proceeding, passed upon several of them.

But, inasmuch as the decision in that case is not binding on the plaintiffs in this suit, it is our duty to examine the questions and to decide them without being influenced, if possible, by what was decided in the eleventh Annual.

Daniel Clark died in the city of New Orleans on the sixteenth day of August, 1813. The *procès verbal* of the magistrate who affixed the seals upon the effects declares: "This day, the sixteenth of the month of August, 1813, and the thirty-eighth of American indep. ndence, we, Gallien Preval, one of the justices of the peace for the city and parish of Orleans, were present at the decease of Daniel Clark, this day, at six o'clock in the afternoon, and we were requested by Richard Relf to affix the seals on all the papers belonging to the estate of the said Daniel Clark, for the accomplishment of which, we in the presence of James Pitot and Dussuau de la Croix, the said Richard Relf, having been requested by us to show us the papers of said estate, and having conducted us to the room of said deceased, proceeded, in the presence of the witnesses above named, to remove all the said papers and to place them in a desk and armoir, which we found in the room of deceased, after which we affixed the seals on the doors of the room, and placed Mr. Francisco Morales as guardian of the said room, who promised, under oath, to fulfill well and faithfully the duties of his charge, and has, together with us and the witnesses named, signed the same on the day, month and year above mentioned.

his

"FRANCISCO ⋈ MORALES.

mark.

"At the moment of the closing the *procès verbal*, the said Richard Relf having found in a trunk of the deceased the olographic will, we removed it in presence of the witnesses above named for the purpose of delivering it to the honorable judge of the Court of Probates.

"(Signed)

"JAMES PITOT.

"DUSSUAU DE LA CROIX.

"RICHARD RELF.

"GALLIEN PREVAL,

"Justice of the Peace."

Thus it appears that James Pitot, the parish judge, de la Croix, Relf and Francisco Morales, and the justice of the peace, Gallien Preval, were present immediately after the death of Clark—nay at his death—and that the justice of the peace affixed the seals on the effects of the succession according to law.

On the seventeenth day of August, 1813, the olographic will of Clark, dated twentieth of May, 1811, was probated by James Pitot, the parish judge.

On the eighteenth of August, 1813, Francis Dussuau de la Croix filed a petition in the Probate Court of the parish of Orleans, in which he represented that he had strong reasons to believe that Daniel Clark had made a testament or codicil posterior to that which had been opened and probated. "And whereas it is to be presumed that the double of the last will, whose existence was known by several persons, might have been deposited with any notary public of the city," he prayed to have the notaries summoned within twenty-four hours to certify under oath if there existed or not in their offices any testament, codicil, or sealed packet deposited by the said Clark.

The notaries were summoned and they certified that they had no will or codicil of the said Clark. It is not pretended that any body ever saw the alleged last will after the death of Clark. And Boisfontaine alone testifies that Clark spoke of the will in his last illness. Boisfontaine states that Clark spoke to him of his last will repeatedly during his last illness, and he said "his will must be taken care of on her (Myra's) account." Again, "he told Lubin, his confidential servant, to be sure, as soon as he died, to ca ry his little black case to Chevalier de la Croix." Is it probable that Clark ever made such statements to this witness? If he felt any uneasiness or doubt about the safety of his will, would he not have had it deposited where it could not have been tampered with. It is proved that the parish judge, Pitot, was named as one of the executors of this will, and that he lived near by Clark. How easily he might have relieved his mind of anxiety about the safety of the will. Is it probable that he could have directed his slave to take his black case and carry it to De la Croix, after his death? He knew that the slave would not have been permitted to take away anything of value from the house after his death. And if he had desired De la Croix to have the will, he would have sent it by his slave during his life.

Again he says, "when, after the death of Clark, the disappearance of his last testament was the subject of conversation, I related what Clark had told me about his will, in his last illness. Judge Pitot and John Lynd told me that they read it not many days before Mr. Clark's last sickness; that its contents corresponded with what Clark had told me about it," etc.

It appears from his testimony and that of Harriet Harper and Bellechasse, that Pitot was one of the executors named in the will, and that in the will was a legacy of five thousand dollars in favor of Judge Pitot's son.

Is it not most wonderful that Judge Pitot who was thus interested, and who believed, according to this witness, that a will had been left by Clark other than the one dated the twentieth of May, 1811, should have probated the said will of 1811 immediately after Clark's death,

and that no effort was made to establish the lost testament during the lives of Judge Pitot or of John Lynd. According to Boisfontaine there were four witnesses alive who had read the will only a short time before Clark's death, and several others who had been told its contents. Judge Pitot was himself one of the witnesses, and John Lynd, one of the notaries summoned to certify if they had such a will, was another, who, it was said, had read the will. Is it probable that Pitot and the other executors of Clark, all personal friends of the deceased, would have failed to make an effort to establish the lost will if the narrative of Boisfontaine had been true?

What amount of reliance is to be placed in the testimony of a witness, who is uncontradicted, who undertakes to give the details of conversations, in themselves not probable, which occurred over twenty years before, it is very difficult to determine. This witness, however, speaks of the conversations which occurred during the last sickness of Clark, and after his death, with a positiveness and certainty that few persons would, in regard to conversations, after the lapse of only a few months. And *to him alone* did Clark speak of his will *during his sickness.* The improbability of the facts detailed by him, and the great length of time which intervened between the period when he testified and the conversations which he details, incline us to attach but little credit to his testimony.

Another remarkable fact is, that although Bellechasse and De la Croix (who were named as executors in the lost will) were with Clark during his last illness, one of them on the day before his death, yet he never mentioned the subject to either of them. They were his cherished personal friends. Boisfontaine was his employe or overseer. De la Croix testified "that after the death of Clark witness was not much surprised that the last will of Clark was not produced or found, for it is to his knowledge that Clark had requested several other persons, as he had deponent, to become his executors," etc. We may fairly infer from this testimony that after De la Croix had had the notaries cited to produce any will or codicil of Clark, deposited with them, and the said notaries had declared under oath that they had no will or codicil of Clark, he and the other friends of Clark adopted the legal presumption that he had destroyed it himself.

That other witnesses had seen a will posterior in date to that of 1811, and that Clark spoke to others about such a will is proved. But it was before his sickness that these witnesses saw the will, or that Clark told them of it.

It is not proved, nor has any attempt been made to prove, that Clark could not have destroyed the will, even after the conversations with Boisfontaine, if they occurred, in which he spoke to Boisfontaine about the will.

When last seen, the will was in possession of Clark, and it could not be found at his death.

The presumption of the law in such a case is, that the testator destroyed it *animo cancellandi,* and the *onus* of rebutting this presumption is cast upon those seeking to establish the will. 1 Redfield on the Law of Wills, 350; 10 Yerger 84; 11 Ala. 596; 6 Wend. 174; 11 Wend. 227; 3 Pick. 67.

There is not a particle of proof in the record to rebut this presumption.

The theory of the witness Bellechasse that Relf destroyed the will is not supported by any evidence. That Bellechasse himself could not have believed the story at the time of the death of Clark and for several years after is abundantly shown, we think, from the confidence he himself reposed in Relf and from the friendly and confidential manner in which he corresponded with him during the year and later after the death of Clark. Either Bellechasse was himself a villain and hypocrite, or he did not believe that Relf was the spoliator he represents him to have been in his testimony, given upwards of twenty years after the occurrences concerning which he testified.

On the ninth of October, 1814, he wrote a letter to Relf, which commenced thus:

"My friend, I have never forgotten you, and your last mark of friendship shows me that the constancy of the misfortune that attaches to everything that relates to you, does not equal your own constancy." * * He concludes the letter thus: "Should you be persuaded that what I have written or said will compromit me, seek an interview with L—, and together engage my family to await me at Pensacola. Neither you, my friend, nor L— shall suffer from advances made for this purpose, as I am in a position to be infinitely useful to you. * * * In the meantime receive my thanks, and believe in the gratitude of your sincere and devoted friend."

In a letter of a subsequent date, he says, "You have yourself to blame, my dear friend, if I have not made a reconveyance of the property that our friend Clark sold to me. I have offered to do so on many occasions, and under some pretext you have always put it off, and permitted me to go without speaking about it." This was in relation to the property placed in Bellechasse's name for the benefit of Myra.

Continuing the letter, he says: "I have, therefore, considered it my duty to write to you, which I now do, and send you the accompanying document, in order to prove that my declaratory act was made before I left Louisiana, and placed in the hands of Pedesclaux. I have preferred this, persuaded that you can do, at little expense, all that can be done; and in order that he can not, in case of a requisition, do any evil, obtain an interview with him, recover from him the documents, for which you will give him your receipt, and all will be finished," etc.

Is it possible that Bellechasse could have thus confided to one, whom he knew or believed to be a villain ?

But be that as it may, there is no evidence whatever to establish the truth of the hypothesis, that Relf destroyed the testament. But a letter written by Bellechasse to Relf, in 1822, would seem to indicate more than a doubt as to whether even he believed that the will had been destroyed by Relf, for he says : "Je ne doute pas que si le testament de Clark ne s'était *perdu*, que l'on aurait vu que la partie de ces biens confiés au Chevalier de la Croix, était désignée à M'lle Caroline, comme peut l'affirmer Mr. et Mde. Harper qui assurent que Clark leur en avait fait l'aveu." But if it be conceded that Bellechasse believed or suspected that Relf destroyed the will, surely the *opinions* or *suspicions* of a witness can not overcome the presumption raised that the testator himself destroyed the will. 3 Phillimon 123. There are other facts in this case which corroborate this presumption. One fact is that Clark left the will of 1811, which was found in his trunk, as stated in the *procès verbal* before mentioned. Another is, that he left in force the secret trusts in favor of Myra. If she was his legitimate child, and he had made a will wherein he had acknowledged her to be such, and constituted her his universal legatee, why did he leave those trusts in her favor unrevoked, and why did he not destroy the former will ? The record shows that Clark was an intelligent gentleman. He must have known that the property left for Myra, in the name of Bellechasse and De la Croix, would be subject to judicial mortgages and legal mortgages against those gentlemen, in spite of themselves. Why would he have unnecessarily subjected that property to such risks ?

The probability is that he would have destroyed the will of 1811 and the secret trusts aforesaid if he had intended to leave the alleged lost testament. Another fact, which corroborates the presumption of the law, is the absence of any motive on the part of Relf to destroy the will of 1813. The will of 1811 was a sealed will, and until it was opened for the purpose of its probate, Relf could not know what its provisions were. On the whole, we are of the opinion that the presumption that Clark himself destroyed the will has not been rebutted by the evidence offered to establish the will. And we have arrived at this conclusion without giving effect to the answers of Richard Relf or to the letter of Mazureau. In the answers of Relf, however, it is emphatically denied that he ever destroyed, or that he ever saw the will; and his answers repel the idea of the existence of such a will, while the letter of Mazureau shows the motive or reason which may have influenced him in destroying the will.

Are the contents of the lost testament of Clark proved by two credible witnesses, who had read, or had had read to them, the lost will ?

Bellechasse, Mrs. Harriet Harper, Boisfontaine and De la Croix are the only witnesses who testify to the existence or contents of the will.

The Chevalier de la Croix said: "Deponent called to see Clark at his house on Bayou Road; he there found him in his cabinet, and he had just sealed up a packet, the superscription on which was as follows : 'Pour être ouvert en cas de mort.' Clark threw it down in the presence of deponent, and told him that it contained his last will, and some other papers which would be of service; deponent did not see the will; does not know anything about its contents; he only saw the packet with the superscription as before related."

Boisfontaine says: "Deponent never saw the last will of Clark; he only saw the package when Clark showed it to Mr. De la Croix."

Bellechasse saw the will, but he never read it. We infer this from his own testimony. He says, in his testimony given in December, 1834. "He (Clark) told the deponent, that he had completed or finished his last will, that the deponent, Judge Pitot, then present, and the Chevalier de la Croix were his executors named in it (the deponent having given his consent before), and that apart from some legacies for his friends, and a due pension for his mother, his said daughter, Myra, was the heiress of his fortune, duly habilitated for that purpose,. and gave the said will open to us to look at and examine. The deponent saw that it was all in his own handwriting and signed by him, the said Daniel Clark." To cross-questions he answered, "That the aforesaid last will of 1813 of said Daniel Clark was shown by him, of his own accord to deponent, and also Judge Pitot at the time mentioned in his answer in chief," etc. And again, he answered, "that although he took neither note nor copy of said will of 1813, yet from the interesting nature of those details that he (Clark) had given of it, he had those details strongly impressed on his memory."

In answer to another set of interrogatories filed in 1837, Bellechasse says: "A very short time before the sickness that ended in his death, he (Clark) conversed with us about his said daughter, Myra, in the paternal and affectionate terms as theretofore; he told us he had completed and finished his last will. He (Clark) therefore took from a small black case his said last will, and gave it open to me and Judge Pitot to look at and examine. It was wholly written in the handwriting of said Daniel Clark, and was dated and signed by the said Clark in his own handwriting. Pitot, De la Croix and myself were the executors named in it, and in it the said Myra was declared to be his legitimate daughter, and the heiress of all his estate." In answer to a cross-interrogatory he answers: "My knowledge of English is limited; but as I have three daughters, one son, and two sons in law, who understand it, and some of them perfectly well, when I require an English translation I avail myself of the services of some or more of my

family." It is not probable from his testimony that he understood the
English language sufficiently well to have read Clark's will; and it
appears pretty clearly from his testimony that what he knew of the
contents or details of the will, he learned from Daniel Clark. This
appears also from the following translation from his letter to Coxe,
dated in 1819: "Unhappily, he (Clark) died and without their having
been able to find the will, which he had very certainly made before
his departure for Natchez, some time before his death, telling me that
I was one of his executors, as well as Messrs. Relf, De la Croix and
Pitot." And again, in the same letter he says: "She (Caroline) may
have been mentioned in the will of which he spoke to me, and which
disappeared God knows how." This visit to Natchez must have oc-
curred upwards of a year before Clark's death, as will appear from his
letter to Coxe, in which he speaks of challenging one Minor to fight a
duel, and would correspond with the date, at which Mazureau says
Clark talked with him about his will. It seems sufficiently proved
that Bellechasse did not read the will, and this fact appears to be ad-
mitted by Mrs. Gaines in her bill in equity, filed in 1836.

"Your orator and oratrix further show unto this honorable court,
and expressly charge, that the said will was wholly written and signed
with the proper hand of the said Daniel Clark, and that the said will
was shown by the said Clark to, and its contents read by the said
Judge James Pitot, the late John Lynd, notary public in and for the
parish and city of New Orleans, Mrs. Harriet Smith and others; and
that the said will was shown also, and its contents communicated by
the said Daniel Clark to the said Colonel Bellechasse, Chevalier de la
Croix, Mr. Pierre Baron Boisfontaine and others."

Mrs. Harriet Harper (or Smythe) swears she read the will. It is
urged, however, that a woman can not be a witness to establish a lost
will; and article 1584 of the Civil Code, which declares that "women
are abolutely incapable of being witnesses to testaments," is relied
upon. That prohibition is to women attesting wills, as clearly appears
from the French text of the article "sont absolument incapables d'être
témoins dans les testaments."

Mrs. Harriet Harper (or Smythe) is the only witness who read the
will. Boisfontaine and Bellechasse, the other witnesses who speak of
the contents of the will, derived their knowledge from the testator.
We do not think this competent evidence to establish the contents
of a lost will. It would practically authorize the making of verbal
testaments, which is not recognized by our laws. Besides, if the
declarations of the testator could be received to prove the contents and
the verity of a lost olographic will, a lost testament could be proved by
evidence, which would be incompetent to prove the will if produced
in court.

Fuentes and al. v. Myra Clark Gaines.

In the succession of Eubanks, this court said: "The appellee con-
tends that the testimony of witnesses, that Mrs. Eubanks (the testator)
had told them said will was entirely written by her, satisfies the law.
We think otherwise.   Article 1648 of the Code is express, that the only
proof admissible of olographic testaments, is the testimony of two
witnesses, that they recognize the hand-writing as having often seen
the testator write or sign during his lifetime."

We are of opinion that it is necessary to prove that the lost will con-
tained all the essentials of an olographic will before it can be admitted
to probate, to wit:   That it was wholly written, dated and signed by
the testator; and the witnesses must state the facts, which are neces-
sary to enable the court to determine whether or not the will is valid.
Marcadó, vol. 4, p. 11.

In this case two witnesses, Harper and Bellechasse, state that the will
was wholly written, dated and signed by Clark.   Bellechasse states it
was dated in 1813; Harper says it was dated in July, 1813.   Is this
sufficient?   Is a testament, which is dated A. D. 1813, or July A. D.
1813, to be deemed dated in the sense of the law?   Certainly not, if
the term dated is to be understood in its "common and usual significa-
tion."   C. C. art. 14, 1946.

Webster defines the word date thus:   "That addition to a writing
which specifies the year, month and day when it was given or exer-
cised."   Bouvier *verbo* date.   Marcadé says:   "Dans l'usage, la date
complète se constitue de l'indication du lieu, de l'année, du mois et du
jour où l'acte s'est fait; mais l'indication du lieu ne saurait être exigée.
En effet, les dates, dans le sens propre de ce mot, ne sont que les
indications des temps, non celles des lieux; les mots date, dater, dans la
loi comme partout ailleurs, n'expriment que l'idée de temps, d'époque;
l'ordonnance de 1735, en exigeant pour les testaments olographes l'indi-
cation des jours, mois et an, ne demandait nullement l'indication du
lieu, et il paraît évident que le Code a entendu la date comme l'enten-
dait cette ordonnance.   Tout le monde est d'accord sur ce point."
Vol. 4, p. 7.   Le principe nous paraît être que la date, qui est exigée
par l'article 970, est celle du jour, du mois, et de l'année."   Demol-
ombe, vol. 21, p. 77.   Merlin *verbo* Testaments, vol. 13, p. 595; Serey
Code Civil, art. 970, p. 427.

It is essential, therefore, to specify the day, month and year to give
a date to a testament, in the sense of article 1588 of the Civil Code.
It is insisted, however, that the said witnesses state "that the will was
dated"—that is true; but to hold that such a declaration in regard to
a lost testament is sufficient would be to substitute the opinions or
judgments of the witnesses for that of the court.   If the will was
dated, what was the date?   The witnesses fail to inform us, except as
above stated.   There is not a jot or tittle of evidence to prove the will

was dated thirteenth July, and we are at a loss to imagine how that date happened to be given to the will, when it was probated in 1856. Again, these witnesses did not see the lost will at the same time, but out of the presence of each other; it can not be certain, therefore, that they testify in regard to the same will, as they have not stated the date of the will.

The witnesses do not state that they ever saw Clark write or sign his name—they do not even say that they were acquainted with his handwriting. From the intimacy between Clark and Bellechasse it is probable that he was familiar with his hand-writing, but it is not probable that Mrs. Harper was so. There is nothing in the record to suggest that she ever saw any of his writing, except the will, which he gave her to read, and which she saw but once. But we are not permitted to imagine what their knowledge was, when the law requires proof to be made of the fact. Article 1655 of the Civil Code provides that "the olographic testament shall be opened, if it be sealed; and it must be acknowledged and proved by the declaration of two credible persons, who must attest that they recognize the testament as being entirely written, dated and signed in the testator's hand-writing, as having often seen him write and sign during his life time."

The right to make a testament at all is derived from the law. The Legislature, which conferred the right, could undoubtedly impose such rules for the probate of wills as it deemed proper; and those rules or restrictions are obligatory upon courts. If we are at liberty to disregard one part of this article of 'he Code, we can disregard it entirely. And, instead of two witnesses, the court might be satisfied with one, or with no witness at all; substituting in lieu of witnesses, letters of the testator to enable the court to decide from a comparison of hand-writing; or, in case of the loss of the will, receiving the proved declarations of the deceased. That would be setting aside the provisions of article 1655 of the Code, and would certainly be legislation on the part of the court; and it is as certainly unauthorized, when there exists positive legislation on the subject, upon which the court is required to act. That the provisions of article 1655 are obligatory upon the courts, was held in the following cases: 9 An. 149, Succession of Eubanks; 18 An. 444, Fox v. McDonogh's succession; 23 An. 117, Sheppard will case.

But, if the court were permitted to infer that Harper and Bellechasse had seen Clark often write and sign, still the evidence would fail to satisfy us that reliance could be placed in the testimony of Bellechasse. His letters written in 1814 and within a few years thereafter, can not be reconciled with his testimony given in 1834 and 1837. In his letter to Relf, dated twenty-third October, 1822, he writes:

"Je ne puis donc rien changer à ma déclaration, sans me parjurer te

ouvrir la porte à un procès que M'lle Mira aurait droit de me faire; de plus, que puis-je vous dire dans un nouveau pouvoir? Surtout ne m'ayant pas renvoyé le premier: je ne puis avoir exactement présentes les expressions de Clark; je pourrais m'en écarter involontairement, ce que je n'ai pu faire à l'époque de mon acte déclaratoire, où elles se trouvaient encore gravées dans ma mémoire. Neamoins, et relativement à M'lle Caroline, je puis dire, et même jurer, que Clark Clark avait une trop belle âme et le cœur trop bien placé pour avoir été capable, ayant deux enfans qu'il adorait, d'en avoir voulu favoriser une, en laissant l'autre exposée à mendier son pain et livrée aux vicissitudes qu'entraîne la misère. Je ne doute pas que si le testament de Clark ne s'était perdu, que l'on aurait vu que la partie de ces biens confiés au Chevalier de la Croix était designée à M'lle Caroline, comme peut l'affirmer Mr. et Mde. Harper, qui assure que Clark leur en avait fait l'aveu," etc.

From this letter it is apparent that he did not know the contents of the will, for he expresses the belief that the lost will contained provisions which would have shown that the property confided to De la Croix by Clark was intended for Caroline. It shows also that Mrs. Harper had assure I him that Clark had told her the same fact. If she had read the will why did she have to state what Clark had told her about it? The letter shows that even at that date he himself could not trust to his memory in regard to the details of a trust confided to him; yet, twelve years later he undertook to tell the details of the will of Clark. In this letter he says Clark had two children whom he adored, while in his testimony he swears that he "never heard said Daniel Clark speak of having any other child besides the said Myra." Again, in his letter to Daniel W. Coxe, he writes that Relf was one of the executors named in the will of 1813, and in his testimony he says he was not. He swears that Clark had lost confi lence in Relf, while Boisfontaine, Cannon and others swear he had not, and all the written evidence in the record, bearing on the subject, goes to contradict him.

But it is not necessary to expose further the unreliability of his testimony; nor to comment upon the testimony of Mrs. Harper in regard to the will, given nearly a quarter of a century after she had read the will. The laws of Louisiana does not allow a lost will to be established by the "dim recollections, imaginations or inventions of anile gossips," as, we trust, we have shown already. Here, as elsewhere, those propounding a lost testament must prove by competent evidence that the will was duly executed by the testator, and that it was in existence at the time of his death.

We have arrived at the following conclusions:

That the evidence does not rebut the presumption of law, that the

will was destroyed by Clark himself, the will having been last seen in his possession.

That in establishing a lost will all the essentials of a will must be proved; and in this case one of the essentials, to wit, a date, has not been proved.

That two creditable persons, who have often seen the testator write and sign, are necessary to prove an olographic will; and the witnesses in this case are not shown to have had any knowledge of the handwriting of the testator.

It is therefore ordered, adjudged and decreed that the judgment of the court *a qua* be affirmed with costs of appeal.

HOWELL, J., *dissenting.* I am unable to concur in the opinion of the majority of the court on several important points in this case, two of which, I think, are fatal to plaintiffs' demand.

The action is one to revoke a will and recall the probate thereof as null, and I can find no interest in the plaintiffs sufficient to authorize them to bring suit in the probate court. They do not allege themselves to be heirs of the testator or (in direct terms) to have derived title to property from his estate through a forced heir or other person, and therefore they have no right of action.

But, if they have such interest as will maintain the action of nullity of a testament, they must be held liable to the law of Louisiana fixing the prescription of such actions. Their allegation that they can not contest the validity of the will in the Circuit Court of the United States, where they say they are sued by the defendant for certain lands, on account of the peculiar jurisdiction thereof, can not, in my opinion, change the rules of pleading, the relations of parties and the laws relating thereto and governing the rights of litigants, so as to maintain them in the attitude of defendants, using as a shield what in their suit they wield as a weapon of attack. If the defendant had a right to sue them in the United States Circuit Court, common justice would accord to them there all the defenses to which they are justly and legally entitled. But if it be true that they can not show in that court, as they allege, that the will or its probate is not valid as to them, it is their misfortune, for which the laws and the courts of Louisiana are not responsible, and we are not authorized, in my opinion, to bend the law to meet their case.

I think the action, if properly brought, is prescribed by five years under article 3542 (3507) of the Civil Code, and that the judgment of the lower court should be reversed and plaintiffs' suit be dismissed.

Rehearing refused.

Writ of error granted March 31, 1873, by Hon. Joseph Bradley, Associate Justice Supreme Court of the United States.